FILED

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA<br>*ex rel.*, Rebecca Saiff,<br><br>Plaintiff,<br><br>v.<br><br>LINCARE, INC.<br>Defendant. | ) Civil Action No. _____<br>) 8:14 cv 979T 35 A£P<br>)<br>)<br>) **COMPLAINT**<br>)<br>)<br>) **FILED UNDER SEAL PURSUANT TO**<br>) **31 U.S.C. § 3729**<br>)<br>)<br>) |

## COMPLAINT

*Qui tam* relator  Rebecca Saiff ("Saiff" or "Relator") brings this action under the

federal False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA") on behalf of the United

States of America to recover funds of which the federal government has been defrauded.

Relator's allegations are based upon her own knowledge, and on an investigation

undertaken on her behalf through Counsel.  Relator alleges as follows:

### I.       NATURE OF THE CASE

1.       This *qui tam* action is an effort to restore to the United States tens, if not

hundreds, of millions of dollars that the defendant has taken through systemic, long-lived,

and continuing fraud, perpetrated through the Medicare program.

2.       Defendant  is  a  supplier  of  durable  medical  equipment,  with

approximately 1,100 locations in 48 states.

3.       The Defendant has engaged in a scheme to wrongfully enrich itself at

taxpayers' expense by fraudulently billing Medicare for equipment rental for which either

the patients or the equipment were not reimbursable by Medicare, by failing to provide

repair services to patients it was obligated to provide, and by retaining overpayments to which it knew it was not entitled.

4.     The fraud alleged herein began no later than January of 2012 and continues to this day.

## II.     PARTIES

5.     Relator Rebecca Saiff is a resident of the State of Florida.  She was employed as a Medicare Billing Specialist at Defendant's corporate headquarters in Clearwater, FL, from January to July of 2013, and in Defendant's Largo, FL Regional Billing and Collection Office from August of 2013 until approximately February of 2014.

6.     Defendant Lincare, Inc. ("Lincare") is a wholly owned subsidiary of Lincare Holdings, Inc.  Both of those entities are corporations organized and existing under the laws of the State of Florida, with their principal places of business at 19387 US 19 N., Clearwater, FL  33764.  Lincare is a Medicare-enrolled provider of various pieces of durable medical equipment ("DME"), including oxygen systems.  It has approximately 1,100 locations in 48 states, and generates hundreds of millions of dollars in revenue each year.

7.     Lincare is organized such that DME is provided from store-front style locations.  Typically, a physician faxes a Certificate of Medical Necessity ("CMN") to the Lincare center, which coordinates with the patient for delivery of the relevant DME. The store then submits the information regarding delivery to a Regional Billing and Collection Office ("RBCO"), which is tasked with submitting the claims to the relevant insurer. There are approximately 44 RBCOs throughout the United States (including Lincare's headquarters, which also functioned as an RBCO until July of 2013).  Relator spent the duration of her Lincare career as a Medicare Billing Specialist at RBCOs.

2

8.       The United States of America is the real party in interest under the FCA and ultimately paid the false claims alleged herein through the Medicare program, a federal health insurance program administered by CMS for the elderly and disabled. *See* 42 U.S.C. §§ 1395-1395hhh.   The United States is thus entitled to the bulk of the recovery sought by this action.

### III.       JURISDICTION AND VENUE

9.       Relator brings this action on behalf of the United States under the *qui tam* provisions of the FCA.

10.       This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. §§ 3732(a), which confer jurisdiction over actions brought under 31 U.S.C. § 3730.

11.       This Court has personal jurisdiction over defendant, and venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because Defendant is located, transacts business, and committed violations of the FCA in this district.

12.       This action is not based upon prior public disclosure of allegations or transactions in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; in the news media; or in any other "publicly disclosed" form as that term is defined in 31 U.S.C. § 3730(e)(4)(A).

13.       To the extent there has been a public disclosure unknown to Relator, she is an original source under 31 U.S.C. § 3730(e)(4).   Relator, prior to any such public disclosure, voluntarily disclosed to the Government the information on which her allegations are based, and/or has knowledge that is independent of and materially adds to

3

the publicly disclosed allegations or transactions and voluntarily provided the information to the Government before filing this action.

## IV.      RELEVANT STATUTES AND REGULATIONS

### A.      The False Claims Act

14.      The False Claims Act ("FCA") imposes liability on any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval ("false claim").   31 U.S.C. § 3729(a)(1)(A).   The FCA defines "claim" to include any request or demand, whether under contract or otherwise, for money that is made to an agent of the United States or to a contractor if the money is to be spent to advance a government program or interest and the government provides or will reimburse any portion of the money.   31 U.S.C. § 3729(b)(2).   The FCA defines "knowingly" to mean actual knowledge, deliberate ignorance of truth or falsity, or reckless disregard of truth or falsity; specific intent to defraud is not required.   31 U.S.C. § 3729(b)(1).

15.      The FCA also imposes liability on any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim ("false statement").   31 U.S.C.  § 3729(a)(1)(B).   The FCA defines "material" to mean having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.   31 U.S.C. § 3729(b)(4).

16.      The FCA also imposes liability on any person who conspires to violate its provisions.   31 U.S.C. § 3729(a)(1)(C).

### B.      Medicare and Tricare

17.      Medicare is a federal health insurance program created by Congress in 1965 for the elderly and disabled.  *See* 42 U.S.C. §§ 1395-1395hhh.   It is the nation's largest health insurance program and covers nearly 40 million people.   Medicare is

4

administered by a federal agency, namely the Centers for Medicare and Medicaid Services ("CMS"). Medicare pays doctors, hospitals, pharmacies, and other providers and suppliers of medical goods and services according to government-established rates. *Id.*

18.     Medicare is divided into several parts, two of which are relevant to this action. Medicare Part A is a prospective payment system that pays hospitals, skilled nursing facilities, and similar providers on a prospective basis, calculated based on the services that each patient is likely to require and the cost to the facility of providing those services to the patient. The amount of prospective payment to be provided to each hospital or nursing home is determined, in part, by a cost report submitted annually by each such facility. That cost report includes, among other things, the cost to the facility of DME (including oxygen systems) used by patients.

19.     Medicare Part B covers, among other things, rental of DME, including oxygen systems. *See generally* 42 CFR 414.226. Defendant bills Medicare Part B. Medicare will only reimburse providers for equipment or services which are medically reasonable and necessary. *See e.g.*, 42 U.S.C. § 1395y(a)(1)(A).

20.     TRICARE, administered by the Department of Defense, is the United States military's health care system, designed to maintain the health of active duty service personnel, provide health care during military operations, and offer health care to non-active duty beneficiaries, including military retirees, active duty personnel, and their respective dependents. TRICARE's medical necessity requirements mirror those of Medicare, as set forth in paragraphs 19 and 65.

21.     Claims for payment submitted to the Government in knowing violation of any material rules or requirements constitute false claims for purposes of the FCA.

Additionally, any person knowingly assisting or participating in the violation of material requirements is liable under the conspiracy provision of the FCA.

### C. Medicare's Requirements For Payment

22.     Home oxygen equipment is one aspect of a category of physical goods typically referred to as "DMEPOS," which stands for Durable Medical Equipment, Prosthetics, Orthotics, and Supplies.

23.     Medicare pays, on a monthly basis, for up to 36 months of home oxygen equipment rental. After that, the supplier who provided the equipment is required to provide as-needed service and repair for the remaining useful life of the equipment, which is deemed to be at least another two years. The supplier is permitted to bill bi-annually for maintenance and service, but is not entitled to further monthly reimbursement for the rental of the equipment. *See* 42 C.F.R. 414.226(f). The amount suppliers may bill for repair and maintenance is significantly less than that of the monthly rental.

24.     After the equipment's reasonable useful life has ended, or the equipment has been lost, stolen, or irreparably damaged, a supplier may replace the equipment and bill for another 36 months of rental. A supplier must furnish replacement equipment to a beneficiary in order to begin the new 36 month billing cycle. *See generally* 42 C.F.R. 414.210(f).

25.     A supplier is entitled to bill Medicare for one month of equipment rental beginning on the date that the equipment is provided, and then monthly on the same date each of the following months. For example, if a patient received oxygen equipment beginning on February 15, the supplier could bill for one month on February 15, and again for a month on March 15, and so on for up to 36 months. The fifteenth of each

6

month would be what is referred to as the "from" date or the "anniversary date" for payment.

26.     However, it is not uncommon for patients who need home oxygen equipment to be absent from their homes for a variety of reasons, including because they have entered hospitals, skilled nursing facilities ("SNFs"), or other treatment centers, or simply because they travel to other areas of the country seasonally (*i.e.* "snowbirds"). In such circumstances, the supplier of the home oxygen equipment is not entitled to payment for the period that the patient was absent from the home. As the Medicare Claims Processing Manual (hereinafter, the "Manual") explains:

> In general, the DMEPOS, benefit is meant only for items a beneficiary is using in his or her home. For a beneficiary in a Part A inpatient stay, an institutional provider (e.g., hospital) is not defined as a beneficiary's home for DMEPOS, and so Medicare does not make separate payment for DMEPOS when a beneficiary is in the institution. The institution is expected to provide all medically necessary DMEPOS during a beneficiary's covered Part A stay.

*See*, Medicare Claims Processing Manual, Chapter 20, § 210.[1]

27.     To address this issue, Medicare regulations and guidelines provide that, where a patient enters a hospital or otherwise is not using equipment, the supplier must adjust the anniversary date to coincide with the date the patient resumes use (*i.e.,* the date of discharge from the hospital). As the Manual explains:

> If a beneficiary using DMEPOS is at home on the "from" date or anniversary date, Medicare pays for the DMEPOS for the entire month, even if the "from" date is the date of discharge from the institutional provider. If a beneficiary using DMEPOS is in a covered Part A stay for a full month, Medicare does not make payment for the DMEPOS for that month.

---

[1] The Manual is accessible at: http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Internet-Only-Manuals-IOMs-Items/CMS018912.html  (last accessed March 27, 2014)

For capped rental items, if the covered Part A stay overlaps the anniversary date ("from" date on the claim), and the beneficiary is not in the covered Part A stay for the entire month, the date of discharge becomes the new anniversary date ("from" date on the claim) for subsequent claims. In this situation, the supplier must submit a new claim with the date of discharge as the new anniversary date upon the beneficiary's release from the institution. Suppliers should annotate the HAO record in NSF claims, 2300 NTE and 2400 NTE for ANSI claims, or field 19 for paper claims, to indicate that the patient was in an institution, resulting in the need to establish a new anniversary date.

*Id.*

28.     Lest there be any confusion on this point, the Manual provides several

examples, including an example directly pertaining to oxygen equipment:

**EXAMPLE 2:** A beneficiary receives oxygen on January 1. On February 28, the patient enters a hospital and is discharged on March 15.

In this example, [Medicare] denies a claim dated March 1. ***The supplier submits a new claim dated March 15, which would then become the anniversary date for billing purposes.*** The supplier should annotate the HAO record (field 19 for paper claims) to indicate that the patient was in a hospital on the first claim with the new anniversary date.

*Id.* (emphasis added).

### D.     The Competitive Bid Program

29.     Pursuant to the Medicare Monetization Act of 2003, CMS has instituted

a Competitive Bid Program for the rental and/or sale of DMEPOS, including oxygen

equipment.     Under that program, the country was geographically divided into

Competitive Bid Areas ("CBA"), with one CBA typically corresponding to one or two

metropolitan areas.     Various providers then submitted bids to CMS for the right to supply

DMEPOS equipment in each area.     The providers whose bids were accepted are known

as "contract suppliers."

30.     Although DMEPOS is one category of equipment, the various pieces of

equipment that may be provided under the competitive bid program are bid upon

separately.  Thus, in some areas a provider may be the contract supplier for one type of equipment, but not others.

31.     Medicare determines a beneficiary's residence as the place where his or her social security check is sent.  If a Medicare beneficiary requires DMEPOS and lives in a CBA, he or she is required to obtain that equipment from the contract supplier for that CBA.  The contract supplier, in turn, bills Medicare an agreed-upon sum for the relevant piece of equipment (either as a rental fee or as a sale price, depending on the equipment).

32.     However, it is not uncommon for Medicare beneficiaries to travel for extended periods of time, for example to visit relatives or to vacation in the winter.  In those circumstances, if the beneficiary is not in a CBA, he or she may obtain the equipment from any supplier.  If he or she is in a CBA, the equipment must be purchased or rented from that CBA's contract supplier, who then bills Medicare for the agreed upon price corresponding to the beneficiary's home address.

33.     To inform Medicare that the beneficiary was travelling (and that, therefore, the beneficiary was not obligated to use the contract supplier in his or her own CBA), the billing entity appends a "KT modifier" to the claim submission.  The "KT" code, which is part of an alphanumeric string submitted to Medicare that explains the benefit for which the provider is claiming reimbursement, causes Medicare's payment system to bypass the beneficiary's normal contract supplier and instead provide payment to the submitting entity.

### E.     Prohibition on Retention of Overpayments

34.     It is a violation of the FCA to retain an overpayment.  *See* 42 U.S.C. § 1320a-7k(d).  42 U.S.C. § 1320a-7k(d)(4)(B) defines "overpayment" as "funds that a

person receives or retains under subchapter XVIII or XIX of this chapter to which the person, after applicable reconciliation, is not entitled under such subchapter."

35.     A person receiving an overpayment must report, return and give the reason, in writing, for the overpayment to the Secretary, State, intermediary, carrier or contractor as appropriate.  42 U.S.C. § 1320a-7k(d)(1)(A)-(B).  The overpayment must be reported and returned within sixty (60) days after the overpayment is identified or the date any corresponding cost report is due, whichever date is later.  42 U.S.C. § 1320a-7k(d)(2)(A)-(B).

36.     42 U.S.C. § 1320a-7k(d)(e) further provides that any "overpayment retained by a person after the deadline for reporting and returning the overpayment . . . is an obligation (as defined in section 3729(b)(3) of Title 31) for purposes of section 3729 . . ."

## V.     DEFENDANT'S UNLAWFUL CONDUCT

37.     The Defendant has engaged in a scheme to defraud Medicare in at least five different respects:  a) by improperly adjusting billing dates in order to bill Medicare Part B for equipment rental on days during which patients were not using the equipment (*i.e.* days when patients were in a SNF or hospital); b) by circumventing the competitive bid process in order to submit claims in areas for which Defendant did not have a contract; c) by retaining overpayments made by Medicare for equipment that had already reached the 36 month "cap" on payments; d) by refusing to perform its contractual obligations to repair rental equipment for five years after its provision to beneficiaries; and e) by billing Medicare for equipment rented to beneficiaries who plainly did not qualify for such equipment, and retaining the resultant overpayment.

38.     Specifically, Lincare has incentivized employees at each of its stores to submit false claims to the RBCOs.  Lincare has achieved this by instituting a policy that store managers and/or sales persons are entitled to be paid commission once a claim is submitted to the accounts receivable department (*i.e.,* before any determination has been made as to whether the relevant insurer will actually pay the claim).  This has led to an overwhelming number of submissions from the stores to the RBCOs that are plainly deficient on their face, for the reasons set forth above.

39.     Nonetheless, Lincare has adhered to this system of calculating commissions.  When Relator pointed out the resultant deficient claims and inquired as to why the system was not changed so that employees received commission only after insurance had paid the relevant claim, she was told by her manager at the time, Brian Nannie, that "[Lincare] would never be able to keep a store manager if we did that."

40.     Rather than correcting store managers and/or sales persons, or simply dis-incentivizing the behavior by changing the commission structure, Lincare has instead opted to enrich itself by pressuring its billing personnel to push claims through to various insurers -- including Medicare and Medicaid -- that plainly should not be paid.

A.      **Lincare Requires its Employees to Improperly Adjust Claim Dates**

41.     As set forth above, Medicare mandates that "anniversary" dates be adjusted to account for hospital stays.  Lincare, however, fails to make this adjustment. Instead, Lincare submits bills to Medicare for periods during which patients were hospitalized or otherwise not using their equipment.

42.     Specifically, Lincare employees deliberately fail to adjust anniversary billing dates for the months after a hospital stay.  Lincare employees do not know when a patient has been hospitalized or admitted to a SNF.  They are alerted to this fact when

11

Medicare initially denies a claim for a particular period of time, on the basis that Medicare records reflect that the patient was in an in-patient facility.

43.     Upon learning of the denial, Lincare employees call Medicare and inquire as to the dates of the stay. They then adjust the billing date for the current billing period so that the claim begins on the day after the stay at the facility (*i.e.* the patient's first day back at home).

44.     However, Lincare employees do *not* change the "anniversary date" (that is, the automatic billing date in Lincare's system). Thus, Lincare ends up submitting two "monthly" bills more frequently than 30 days apart, effectively billing for the overlapping days twice.

45.     By way of example, if a patient's anniversary date was the fifth of the month, and the patient was in a hospital from the first to the tenth of the month, Lincare would re-submit the claim for the month at issue as beginning on the tenth. However, Lincare still receives one month of payment -- for the tenth of the current month through the tenth of the next month. But Lincare would still commence the next billing cycle on the fifth of the month, thus allowing Lincare to effectively bill twice for five days (from the fifth to the tenth).

46.     Although Relator personally refused to engage in this behavior, she saw both of her immediate supervisors, Heather Freeman and Tram Vo, engage in this behavior, as well as other Lincare employees in positions similar to Relator's.

47.     During the course of her employment, Relator overheard a conversation during February of 2014 in which Ms. Freeman stated that in that month alone, Relator's office had used this sort of "adjustment" to receive over $23,000 from Medicare.

**B.      Lincare Employees Improperly Use the KT Modifier to Submit
         Claims for Reimbursement to Which Lincare is not Entitled**

48.     Lincare is the contract supplier of oxygen in many, but not all, of the

country's CBAs.  In particular, Lincare is NOT the contract supplier in any of the

following CBAs:

- Akron, OH;
- Bronx-Manhattan NY CBA;
- Dayton, OH;
- Deltona-Daytona Beach-Ormond Beach, FL;
- El Paso, TX;
- Fresno, CA;
- Honolulu, HI;
- Houston-Sugar Land-Baytown, TX;
- Indiana-Chicago Metro CBA;
- Las Vegas-Paradise, NV;
- McAllen-Edinburg-Mission, TX;
- Ocala, FL;
- Orange County CBA;
- Oxnard-Thousand Oaks-Ventura, CA;
- Palm Bay-Melbourne-Titusville, FL;
- Phoenix-Mesa-Glendale, AZ;
- Poughkeepsie-Newburgh-Middletown, NY;
- San Diego-Carlsbad-San Marcos, CA;
- San Jose-Sunnyvale-Santa Clara, CA;
- Stockton, CA; and
- Tucson, AZ.

49.     Thus, as set forth above, Lincare should not provide oxygen to

individuals that reside in those CBAs.  Nevertheless, Lincare is sometimes approached by

individuals who reside in those CBAs who are seeking oxygen equipment.  This happens

for a variety of reasons, including because Lincare is a contract provider of other

DMEPOS in the relevant CBA, or because the individual's residence is in an adjoining

CBA.

50.     When these beneficiaries approach Lincare, Lincare is obligated to refer them to the contract supplier of oxygen for their CBA.  Instead of doing this, however, Lincare employees simply provide the sought-after equipment and bill Medicare as usual.

51.     When Medicare denies the claims on the ground that Lincare is not the contract supplier for that CBA, Lincare employees are instructed to simply apply the "KT" modifier, indicating -- falsely -- that the beneficiary was travelling outside his or her CBA and that the oxygen was supplied by Lincare in a non-CBA.  The employees then re-submit the claim, and Medicare pays it.

52.     Relator was personally instructed on more than one occasion to re-submit claims using the KT modifier.  Relator resisted these instructions, and bluntly told her superiors that this behavior constituted Medicare fraud.  Relator's superiors responded that "this is the Lincare way."  In one instance, Relator's supervisor, Heather Freeman, explicitly told Relator that her refusal to engage in this behavior could have an adverse impact on her employment.  Shortly after this conversation, Relator was summoned to a meeting with Ms. Freeman and Tram Vo, Relator's "Team Lead", who reported directly to Ms. Freeman.  At this meeting, Ms. Freeman and Ms. Vo again instructed Relator to use the KT modifier to re-submit claims.  On another occasion, Ms. Vo informed Relator that she could potentially lose her job if she refused to apply the KT modifier.  Relator continued to resist.

53.     Ultimately, Relator refused to participate in this behavior, at which point her superiors directed that another, inexperienced employee deal with all resubmissions that required the KT modifier.  However, Relator's other duties, which include reviewing accounts receivable reports, still allowed her to see when the KT modifier was applied.

Relator thus knows that the other, inexperienced employee continued to apply the KT modifier as instructed, despite Relator's warnings to her superiors that this behavior constituted fraud.

### C.    Lincare Bills for "Replacement" Equipment it Does Not Provide

54.    As set forth above, suppliers of home oxygen equipment may replace the equipment after its reasonable useful life, and can then begin billing Medicare for another 36 months of rental.  If the equipment does not need to be replaced, the supplier is not entitled to bill Medicare for rental for any period beyond 36 months.

55.    Lincare, however, does precisely this.  Specifically, Lincare purports to provide replacement equipment to patients and bills Medicare accordingly, but does not actually provide any such equipment.

56.    During the course of her employment, Relator frequently encountered records reflecting that pieces of equipment had been picked up and "redelivered" to the same beneficiary on the same day, and that Lincare had commenced billing for this "redelivered" equipment as though it were replacement equipment.

57.    In one particularly egregious example, Lincare's records reflected that it had billed Medicare for over *one hundred and forty months* of rental for the same piece of equipment -- almost four times the allowable period.

58.    In addition to violating Medicare rules, this behavior has implications for patient safety, particularly when combined with Lincare's reluctance to perform maintenance and service, set forth below.

### D.    Lincare Fails to Abide by its Obligations as a Contract Supplier

59.    As set forth above, after the 36 month "cap" on rental fees expires, suppliers are entitled to a bi-annual fee for maintenance and service of equipment.  This

maintenance includes both routine cleaning and provision of disposable parts (for example, breathing tubes), as well as more extensive repairs.

60.     Because the additional payments to Lincare for this maintenance service are far lower than the rental fees, the stores have little incentive to provide that service. This has resulted in numerous instances in which Lincare centers have failed to respond to customer complaints that equipment needs repair.

61.     In one instance, Relator learned of a patient whose breathing tubes had not been properly cleaned or replaced for months on end.  This is not only contrary to Medicare's guidelines, it is dangerously unsanitary.  In that instance, Relator refused to submit additional bills to Medicare until the center replaced the breathing tubes.  This is only one example of a common pattern at Lincare.  Some of the worst offenders are the stores at Jacksonville, Palm Springs, and Vero Beach.

62.     Lincare's fraudulent billing is so pervasive that in some instances, it has even billed for maintenance of equipment that it had already retrieved from the patient. In one example, Relator stumbled across billing records that showed Lincare had retrieved equipment from a patient's home in 2012, but as late as September of 2013, had continued to bill Medicare for "maintenance" of that same equipment.

E.     **Lincare Knowingly Retains Overpayments in Violation of the FCA**

63.     In addition to submitting claims that are patently false, Lincare has availed itself of the immense strain placed upon Medicare's auditors in order to bill for claims that should not be paid.  Lincare has done this through two separate schemes:  by submitting claims for payment that are unqualified on their face, and by billing for rental equipment past the 36 month "cap" on payments.  In each instance, although Lincare

knows that the claims for payment should not be paid, it has billed for as long as possible and then retained what it knows to be overpayments, in violation of the FCA.

### 1. Lincare Retains Overpayments for Medically Unnecessary Claims

64.     In order to qualify for home oxygen treatment under Medicare and TRICARE guidelines, beneficiaries must undergo a series of tests that measure the oxygen levels in their blood, their respiratory rate, and so forth. There are particular metrics that a beneficiary must have in order for oxygen equipment to be considered medically necessary (and thus reimbursable by Medicare and/or TRICARE).

65.     A patient's qualifications for home oxygen treatment are set forth in a Certificate of Medical Necessity. Essentially, a doctor refers a patient to Lincare to procure the equipment and, simultaneously, to a third party that conducts the various tests on the patient that will determine whether the patient qualifies for home oxygen treatment.

66.     Lincare will then coordinate with patients to arrange delivery of home oxygen equipment, while awaiting the results of the diagnostic testing. Once the results of the diagnostic testing arrive, Lincare employees record them on a CMN which they then fax to the doctor, who signs it and faxes it back.

67.     Predictably, not all patients' results qualify them for home oxygen treatment. Nevertheless, Lincare employees are instructed to provide the equipment and submit the claims to Medicare or TRICARE. Indeed, in some instances, Lincare begins billing even before the results of the diagnostic tests are available.

68.     Because Medicare and/or TRICARE personnel are inundated with claims on a daily basis, they seldom check to verify that the test results recorded on the

CMNs actually qualify patients for home oxygen. Instead, they simply check to ensure that a CMN is attached, and pay the claim.

69.     On occasions where Medicare or TRICARE denies the claim, Lincare invoices patients directly, sometimes threatening to send them to collections. More often, however, Medicare or TRICARE pays the claim. Because the guidelines for what is reimbursable are clear, and because these claims fall outside those guidelines, such payments constitute overpayments, which Lincare is obliged to return to the relevant insurer. Instead, Lincare keeps these funds for itself.

### 2.     Lincare Retains Overpayments for Rental Equipment After 36 Months, or After Patients Cease Using Equipment

70.     As set forth above, Medicare will only reimburse suppliers for 36 months of rental payments of oxygen equipment. After that time, Medicare will reimburse suppliers every six months for equipment maintenance and repair for another two years. At the end of this period, a beneficiary is entitled to receive new equipment, and the cycle begins anew.

71.     Typically, Medicare does not immediately cease payment after the 36th month. Rather, it takes approximately 3 months for Medicare to begin denying claims.

72.     Lincare takes advantage of this by continuing to submit monthly claims to Medicare for equipment rental, despite the fact that Lincare's own records show that they have received 36 months' worth of reimbursement for that equipment.

73.     In a related scheme, Lincare has availed itself of the confusion that arises when patients switch providers. Specifically, if a patient switches from a previous supplier to Lincare prior to the 36 month "cap", Lincare is entitled to bill only for the remainder of the 36 months (with some exceptions that arise in the last ten months or so

of payment). For example, if a patient has used another supplier's oxygen equipment for 20 months, and then switches to Lincare, Lincare may bill only for an additional 16 months of rental. Additionally, Lincare is obligated to work with the previous supplier to arrange for pick-up of the old equipment and delivery of the new equipment.

74.     Lincare, however, does not abide by these obligations. Instead, Lincare simply delivers all equipment as though it were new equipment, and commences billing for all 36 months. Medicare does not always catch these "erroneous" bills, and even where it does, it typically overpays by approximately three months or so.

75.     Likewise, when a patient switches from Lincare to another provider, Lincare often continues to bill for equipment long after the patient has switched to a new provider, and in some cases even after Lincare has retrieved the equipment.

76.     In a similar vein, Lincare employees often refuse to pick-up equipment after patients inform Lincare that they no longer want it. For example, some patients need oxygen only sporadically. Although patients are entitled at any time to sign a waiver and have equipment picked up (and thus, no longer billed against the patient's Medicare benefits), Lincare employees simply refuse to pick-up equipment prior to the 36 month cap, instead claiming (falsely) that they are unable to pick up equipment without a doctor's order.

77.     On one occasion, a Lincare employee was contacted by a patient who had switched doctors and re-taken the tests that determine whether one needs oxygen. Having determined, pursuant to the later test, that the patient did not need oxygen, the new doctor told the patient to cease using her home equipment. Nevertheless, when the patient contacted Lincare, not only did the customer service representative claim that

Lincare could not pick equipment up without a doctor's order, she actually instructed the patient to resume using the equipment -- a piece of medical advice that Lincare employees are wholly unqualified to dispense, and which was contrary to the treating physician's advice.

78.     In any event, it is clear that if a patient has requested that the equipment be removed from his or her home, that patient is not using the equipment, rendering it medically unnecessary and therefore not reimbursable by Medicare. Nevertheless, in all of the previously described situations, Lincare continues to bill Medicare for the equipment.

79.     Even if such claims could credibly be construed as "errors," Lincare would be obligated to return the funds to Medicare. Instead, Lincare employees who have discovered these "erroneous" payments have been instructed to retain them.

80.     Lincare's behavior is no accident. On one occasion, one of Relator's co-workers, Kathy Robinson, repeatedly insisted that Lincare refund approximately $250,000 of improperly paid Medicare funds. In retaliation for this behavior, Lincare demoted Ms. Robinson from Supervisor to Collector, causing an approximately 40% reduction in her salary.

## COUNT I
## SUBMISSION OF FALSE CLAIMS TO MEDICARE PART B IN VIOLATION OF FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(A)

81.     Relator repeats and re-alleges each and every allegation contained in paragraphs 1 through 80 of this Complaint as if set forth herein at length.

82.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A) and (B).

83.     As a result of the misconduct alleged herein, Defendant knowingly presented, or caused to be presented, to the United States false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

84.     As a result of the misconduct alleged herein, Defendant knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

85.     The United States, unaware of the false or fraudulent nature of these claims, paid such claims when it would not otherwise have done so if it had known the truth.

86.     By reason of these payments, the United States has been damaged, and continues to be damages, in a substantial amount to be proven at trial.

**COUNT II**
**RETENTION OF OVERPYAMENTS IN VIOLATION OF FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(G)**

87.     Relator repeats and re-alleges each and every allegation contained in paragraphs 1 through 80 of this Complaint as if set forth herein at length.

88.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(D) and (G).

89.     As a result of the misconduct alleged herein, Defendant has possession, custody, or control of property or money owed to the Government and knowingly delivered less than all of that money or property.

90.     As a result of the misconduct alleged herein, Defendant knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly

concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

91.     The United States, unaware of the false or fraudulent nature of Defendant's conduct, has not sought reimbursement of monies owed it and has continued to make additional payments to Defendant it would not otherwise have made.

92.     By reason of this, the United States has been damaged, and continues to be damaged, in a substantial amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Relator prays that judgment be entered against the Defendant, ordering that:

A.     Defendant's assets be frozen until the final resolution of this action;

B.     Defendant cease and desist from violating the federal False Claim Act, 31 U.S.C. § 3729, et seq.;

C.     Defendant pay the United States not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729 plus three times the amount of damages the United States has sustained because of Defendant's misconduct;

D.     Relator be awarded the maximum relator's share allowable pursuant to 31 U.S.C. § 3730(d);

E.     Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d), and any other applicable law or regulation;

F.     Defendant be enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay damages, penalties, fines, attorneys' fees and costs awarded by the Court; and

G.     The United States and Relator be awarded such other, further or different relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Relator hereby demands trial by jury.

DATED: April 24 , 2014

_K. J. Dark_
Kevin J. Darken, Esq.
The Cohen Law Group
201 E. Kennedy Blvd., Suite 1950
Tampa, Florida 33602

Roland W. Riggs
J. Birt Reynolds (FL Bar # 10029)
**MILBERG LLP**
One Pennsylvania Plaza
New York, NY  10119-0165
(212) 594-5300
rriggs@milberg.com
breynolds@milberg.com


## CERTIFICATE OF SERVICE

The undersigned certifies that on this 24th day of April 2014, a copy of the foregoing

Complaint was served on the individuals below by placing the same in the United States

Mail, first class postage, affixed, and addressed as below:

Via Certified Mail, Return Receipt Requested:

The Honorable Eric H. Holder, Jr.
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue N.W.
Washington, DC 20530-0001

The Honorable A. Lee Bentley, III
Acting United States Attorney
400 North Tampa Street, Suite 3200
Tampa FL 33602


_K. J. Dark_
Kevin J. Darken

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| UNITED STATES OF AMERICA ex rel. REBECCA SAIFF | LINCARE, INC. |

| **(b)** County of Residence of First Listed Plaintiff _____ *(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant _____ *(IN U.S. PLAINTIFF CASES ONLY)*  NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)*  Kevin J. Darken, Esq., The Cohen Law Group, 201 E. Kennedy Blvd., Ste. 1950, Tampa, Florida 33602 (813) 225-1655 | Attorneys *(If Known)* |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question *(U.S. Government Not a Party)*

☐ 2  U.S. Government Defendant

☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☒ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | | ☐ 367 Health Care/ | | | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters ☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other ☐ 550 Civil Rights ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from Another District *(specify)*

☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
31 U.S.C. § 3729 et. seq.

Brief description of cause:
False Claims Act qui tam

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE  4-22-14

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____